## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GE-HARRIS RAILWAY ELECTRONICS, L.L.C., ) | )<br>) **REDACTED**<br>) **PUBLIC VERSION** |
| and | ) |
| | ) |
| GE-HARRIS RAILWAY ELECTRONICS<br>SERVICES, L.L.C., | )<br>) Civil Action No. 99-070 GMS |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| WESTINGHOUSE AIR BRAKE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## CORRECTED GETS' REPLY MEMORANDUM TO WABTEC'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR AWARD OF REASONABLE ATTORNEYS' FEES AND EXPENSES

OF COUNSEL:
Charles D. Ossola, Esq.
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004-1202
202-942-5075

Timothy R. DeWitt, Esq.
24IP LAW GROUP USA, PLLC
600 Cameron Street
Alexandria, VA  22314
703-340-1686

Dated:  November 4, 2005

RICHARDS, LAYTON & FINGER, P.A.
Frederick L Cottrell, III (#2555)
Cottrell@rlf.com
Anne Shea Gaza (#4093)
Gaza@rlf.com
One Rodney Square
920 N. King Street
P.O. Box 551
Wilmington, DE  19899-0551
302-651-7700

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. ii

I. Introduction ........................................................................................................... 1

II. Wabtec's Argument............................................................................................... 2

III. The Total Number Of Hours Charged By Gets' Legal Team In This
Proceeding Was Not "Excessive And Unreasonable" ......................................... 3

    A. The Alleged "Related Matters" Included in GETS' Fee Motion Were,
    in Fact, Contempt-Related ............................................................................... 6

    B. The Research Charges Included in Appendix 3 Were
    Reasonable ...................................................................................................... 8

    C. The Alleged "Duplicative Work" Identified in Appendices 4, 5 and 6
    Was Not Redundant and Was Reasonable ..................................................... 10

    D. The Charges Reflected in Appendix 7 Were Not "Overhead Items" ............ 14

    E. Wabtec's Claim of Nearly       of "Inadequately Documented"
    Charges Is Without Merit................................................................................ 15

IV       Proposed Deduction For Partially Successful Or Unsuccessful
Claims Should Be Rejected As Inconsistent With The Outcome
And Equities Of This Case ................................................................................. 16

CONCLUSION........................................................................................................... 20

REDACTED

TABLE OF AUTHORITIES

Cases

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) ............................................................................................18

*Microsoft Corp. v. United Computer Resources of New Jersey, Inc.*
216 F. Supp. 383 (D. N.J. 2002) .....................................................................7, 14

*Robin Woods Inc. v. Woods,*
28 F.3d 396 (3d Cir. 1994) ..................................................................................7

*Rode v. Dellarciprete,*
892 F.2d 1177 (3d Cir. 1990) .................................................................15, 18, 19

*Washington v. Philadelphia County Court of Common Pleas,*
89 F.3d 1031 (3d Cir. 1996) ..............................................................................19

REDACTED

Pursuant to the Court's Order of September 26, 2005, Plaintiff GE Transportation Services Global Signaling, LLC ("GETS") respectfully submits this Reply Memorandum responding to the arguments presented in Wabtec's Supplemental Opposition to GETS' Motion for Attorneys' Fees and Related Expenses filed October 14, 2005.

## I.    INTRODUCTION

According to Wabtec, GETS achieved only "partial success" on its motion for contempt. Indeed, if a reader of Wabtec's latest brief was unfamiliar with the record, he or she would be surprised to learn that Wabtec was found, by clear and convincing evidence, to have violated both Paragraph 2 and Paragraph 4 of the Consent Order – the only two paragraphs that formed the basis for the contempt action

After agreeing to the Consent Order, Wabtec performed a superficial modification of its distributed power product by simply renaming critical security messages, and did its best to cover its tracks in doing so   Barred by the Consent Order from allowing certain key employees to develop, market or sell its distributed power product for a three-year period, Wabtec blatantly ignored this restriction.

Most egregious of all, and nowhere mentioned in Wabtec's latest brief, it intentionally destroyed clearly relevant evidence in anticipation of further legal proceedings   Yet, having obstructed GETS' discovery and this Court's fact-finding, Wabtec steadfastly maintains that GETS' attorneys over-litigated this case – notwithstanding Wabtec's efforts to ensure that enough evidence would "disappear" and thereby prevent GETS from meeting its high burden of proof in establishing contempt

Wabtec's tactics of obfuscation and obstruction did not succeed – in the end, they allowed this Court to find against Wabtec on several key issues of fact   Wabtec's present

REDACTED

effort to dodge responsibility for paying most of GETS' reasonable attorneys' fees and expenses should similarly fail

GETS will demonstrate below that Wabtec's characterizations of alleged unreasonable and excessive attorneys' fees and expenses by GETS' lawyers are highly misleading and inaccurate. Furthermore, Wabtec's proposed modification of the lodestar by an additional ⟩ to account for GETS' "partial success" is unsupported by both the outcome and equities of this proceeding. GETS should be awarded its attorneys' fees and expenses requested in this motion.

## II.    WABTEC'S ARGUMENT

In its Supplemental Opposition, Wabtec argues that GETS' fee request should be reduced by nearly two-thirds – from                              because the total number of hours charged by GETS' legal team was "excessive and unreasonable." Opp. 7. In support of this position, Wabtec presents five arguments:

- The issues in the contempt proceeding "were not unusually complicated" and GETS' litigation counsel already had a working knowledge of the technology and underlying patent issues. Opp. 7-8.

- The number of hours charged by the GETS' legal team, standing alone, demonstrates that they were "excessive and unreasonable." Opp. 11.

- The requested fees included work on "related matters" that "were not required for nor directly related to the prosecution of the contempt matter." Opp. 12.

- The requested fees included "an unreasonable amount of time for research." Opp. 14.



- The requested fees included time for "duplicative work," *i e,* research and work on court filings "by more than one timekeeper." Opp. 14

  - The fee application included charges for "overhead items"

    spent by legal assistants. Opp 16.

- The fee application included "insufficiently documented time and disbursements " Opp 16

In addition to these deductions, Wabtec asks the Court to reduce GETS' fee award by ⸺ based upon GETS' "partial success" in the contempt action   Opp. 20 For the same reason, Wabtec urges the Court to disallow in their entirety the fees of GETS' technical and damages experts (Nichols and Carter), and to reduce the fees of the computer trial consultant (Litigation Communications) by

GETS respectfully submits that the drastic reductions advocated by Wabtec are not justified by the facts and outcome of the contempt action and that the requested fee award is reasonable and supported by the record. While Wabtec now accuses GETS of "over-litigating" this action, it is striking that Wabtec never made any objection to the discovery, briefing and evidentiary hearing procedures that have been employed in this litigation with Wabtec's full and active participation.

## III.   THE TOTAL NUMBER OF HOURS CHARGED BY GETS' LEGAL TEAM IN THIS PROCEEDING WAS NOT "EXCESSIVE AND UNREASONABLE"

Wabtec's argument that the total number of hours charged by GETS' legal team was "excessive and unreasonable" is predicated on two grounds:   first, the issues involved "were not unusually complicated"; and second, GETS' lawyers were up-to-speed on the technology and patent issues and should not have had to bill the number of



hours actually billed in order to prevail in this proceeding.   Neither of these premises
sustains Wabtec's argument

Wabtec presents a sanitized account of the procedural history of this contempt
action in an effort to substantiate its claim that the issues were straightforward.  But they
were not, and Wabtec did its best – by cleverly masking its changes to the source code
and by destroying evidence – to complicate GETS' efforts to determine whether, and to
what extent one or more violations of the Consent Order had occurred

From a litigation standpoint, this contempt action was more akin to a reprise of
the parties' patent dispute than it was a simple contract dispute.   Paragraph 2 of the
Consent Order cross-referenced the patent licenses granted to Wabtec in the settlement
agreement.   Amended Consent Order, ¶ 2.   Those licenses were limited by several
conditions, one of which was tied directly to the link and link reply messages described in
the '280 patent "or any other denominated messages having the function ascribed to"
those messages.  Settlement and License Agreement, ¶ 2(d)(i).

Resolution of GETS' claim that Wabtec's reorder/reorder reply messages
performed the same function as the link/link reply messages referenced in the '280 patent



required consideration of the technical features of the FreightCorp 90 system. It also required detailed consideration of the meaning and function of link/link reply messages in the '280 patent, which had not been at issue in the preceding patent litigation.[1]

The other technical issues presented by GETS' contempt motion were similarly complex and were not litigated in the underlying patent case. The brake pipe continuity test and the use of differential pressure transducers presented highly technical issues that were properly the subject of expert testimony (Nichols). Wabtec's own discussion of these issues spanning 23 paragraphs in its proposed findings of fact belies its *post hoc* characterization of the issues as simple solely for fee purposes.

Wabtec's vanilla account of the proceedings in this case also ignores the difficult task GETS faced in demonstrating to the Court that a contempt proceeding should be commenced. While Wabtec notes that the GETS' legal team charged          hours for the work involved in investigating the FreightCorp 90 system and then briefing the motion for contempt, Wabtec makes no mention of the technical challenges of deciphering the meaning and significance of the changes to the earlier source code and analyzing the contempt issues that the technical investigation brought to light. It was GETS' burden to demonstrate to the Court that there was a solid factual basis for initiating a contempt proceeding — otherwise, there would have been no discovery period or opportunity to

---

[1]    Despite Wabtec's assertion that the contempt action involved simple and straightforward contract issues, Wabtec nevertheless submitted 59 pages of proposed findings of fact and conclusions of law, with 127 paragraphs of proposed factual findings. Of those 127 paragraphs, 36 were devoted to the subject of link/link reply messages in the '280 patent.

REDACTED

present evidence at trial. GETS carried that burden, but not without a substantial and necessary investment of time and effort by its lawyers and technical experts.[2]

In sum, irrespective of the GETS' attorneys' familiarity with the patents and earlier versions of Wabtec's technology, their investigation of the contempt issues was far from a straightforward matter. Similarly, extensive work was required to show cause why a contempt proceeding should be initiated, to explore numerous factual issues in discovery and then to prepare for and present the case at trial. The parties' voluminous post-trial proposed findings of fact and conclusions of law further undermine Wabtec's mischaracterization of this contempt proceeding as simple and straightforward.[3]

### A. The Alleged "Related Matters" Included in GETS' Fee Motion Were, in Fact, Contempt-Related

In Appendix 2, Wabtec sets forth the time entries that it argues represents "work on matters unrelated to the contempt motion." Opp. 12; App. 2. Wabtec characterizes these matters as "independent" of prosecution of the contempt motion. Opp. 14. The time entries themselves belie this assertion and Wabtec proposes an unduly narrow view of what was fairly encompassed by the contempt proceeding.

---

[2] Wabtec contends that GETS' expert witness fees should be disallowed in their entirety, but never explains why the    hours that Jackson spent reviewing the source code and preparing his report in support of the motion for contempt was unreasonable. Opp. 10 n.10. In fact, Jackson's time was essential to assist GETS' lawyers in understanding what Wabtec had done to the source code and the significance of the changes.

[3] Wabtec's brief recitation of the evidentiary hearing itself is another illustration of the misleading picture that Wabtec presents. Opp. 10-11. The fact that few fact witnesses testified at the hearing was largely due to Wabtec's decision not to present key witnesses' testimony in open court. Indeed, not a single Wabtec employee with first-hand knowledge of the facts was presented at trial – not Darlo Concepcion (who made the changes to source code), not Kull (whose personal involvement was a central issue) and not anyone else at Wabtec who was involved in the development of the FreightCorp 90 system or the offer to sell it to QR. As a result, many of the facts relating to these subjects had to be presented through deposition testimony in GETS' proposed findings of fact.

REDACTED

"It is well settled in the Third Circuit that a prevailing party in a civil contempt matter is entitled to recover costs for investigating, preparing and conducting the contempt proceeding." *Microsoft Corp v United Computer Resources of New Jersey, Inc.*, 216 F. Supp. 383, 390 (D N J. 2002), *citing Robin Woods Inc v Woods*, 28 F.3d 396, 400 (3d Cir. 1994). The time entries reflected in Appendix 2 constitute recoverable costs under this standard.

- The majority of these time entries relate to GETS' investigation of the potential contempt claim – in particular, whether the proper remedy for Wabtec's conduct would be a motion for contempt (subject to a clear and convincing burden of proof) or a breach of contract claim (subject to a lower burden of proof), possibly accompanied by a motion for preliminary injunction [4] It was only after these remedies were researched and analyzed did GETS' lawyers conclude that a contempt proceeding was the appropriate procedural vehicle for challenging Wabtec's conduct. This work was plainly related to – was in fact a part of – GETS' investigation of the issues and the results of that investigation were ultimately presented in a motion for contempt.

- Other time entries in Appendix 2 relate to potential settlement of the contempt claim. Time spent on settlement discussions or the development of settlement proposals that arise from, and are prompted by, the contempt motion itself are not "independent" matters clearly separable from the prosecution of the consent motion.

---

[4]

REDACTED

- GETS agrees that a six time entries relating to the defense of a related but separate case that Wabtec filed against GETS were inadvertently included in the fee petition and should be deleted  Items 62-66, 99, totaling                          [5]

### B.    The Research Charges Included in Appendix 3 Were Reasonable

Wabtec argues that approximately                  of research time identified in Appendix 3 was unreasonable and was unnecessary to the prosecution of a contempt motion that Wabtec claims did not involve "any particularly unique or novel legal issues " Opp  14  This argument is another example of Wabtec's *post-hoc* reconstruction of what was reasonably necessary to litigate successfully this contempt action

The initial flaw in Wabtec's argument is its suggestion that only "particularly unique or novel legal issues" warrant thorough research  That is simply not true, and a great deal of complex civil litigation – including many patent-related disputes – may not rise to this lofty level  But that does not mean that the issues and stakes involved do not warrant a substantial investment of time spent researching the key issues

Furthermore, contrary to the impression Wabtec seeks to create, contempt actions in federal court are, thankfully, rare and often (as in this case) do not present routine issues [6]  That is especially true in the context of this case, in which the Consent Order at issue cross-referenced a settlement and license agreement that, in turn, referenced two patents that had been the subject of prior litigation  It was by no means clear, when

---

[5] This amount has been deducted from the total amount of fees sought by GETS in this motion, as reflected in the Conclusion *infra*

[6] It is worth noting that in over 25 years of practicing law in the federal courts, GETS' lead counsel never has had occasion to bring a motion for contempt – until this case

REDACTED

GETS learned that Wabtec had won the QR bid, that a contempt remedy was the appropriate one. GETS' counsel acted reasonably in thoroughly researching other options before arriving at the conclusion that the contempt vehicle was not only appropriate but was also the best remedy for their client

In fact, many of the research entries included in Appendix 3 involved issues such as lost profits under Delaware law that were relevant both to a contempt action and to other potential causes of action such as breach of contract (*i e*, breach of the settlement and license agreement). *See, e g.*,

Appendix 3 also includes approximately         in research, e-mail communications and other work relating to potential waiver of attorney-client privilege that arose in connection with the analysis of the contempt and other remedies *See* Items 151-160  Without disclosing the subject matter of this inquiry, it was entirely appropriate for GETS to include in its fee application the time spent on legal issues such as waiver that arose in connection with its investigation of possible contempt charges

Finally, Appendix 3 includes approximately         of associate time spent researching the law relating to the "offer to sell" issue raised by the motion for contempt. As the Court recognized in its opinion, one of GETS' central contentions was that Wabtec made an "offer to sell" the FreightCorp 90 system to QR (Mem. Op. 3-4) Research into the meaning of that legal term under the patent law (where it is a term of

REDACTED

art) and Delaware law was appropriately addressed by an associate on GETS' legal team.[7]

### C. The Alleged "Duplicative Work" Identified in Appendices 4, 5, and 6 Was Not Redundant and Was Reasonable

Wabtec argues that various time entries reproduced in Appendix 4 to its brief were "duplicative" because they represent "research on the same issues and preparation of court filings . . conducted by more than one timekeeper." Opp. 14. Wabtec further contends that time entries for work on court filings reflect "an unnecessary and unreasonable duplication of effort." Opp. 15. These arguments are based on false assumptions and a misreading of the pertinent time entries.

With respect to the alleged "duplicative entries" in Appendix 4, GETS responds as follows:

- Two associates at A&P performed research on such questions as

(Items 182-185). There is no factual basis for Wabtec's assumption that these two associates were performing duplicative work.

- Three associates at A&P and one at RL&F performed research, at various times, on contempt-related issues such as

questions. Items 186-193. The _____ issues in this case were significant and required consideration of Federal Circuit and Third Circuit law. Furthermore, the

---

[7] The fact that Wabtec ultimately did not dispute that it had made an "offer to sell" distributed power units to QR is not a legitimate ground for disallowing these research costs. At the time these costs were incurred in July through November of 2002, GETS had no way of knowing whether or not this point would be disputed by Wabtec or questioned by the Court.



issues presented by a contempt proceeding are not commonly litigated in civil cases and warranted careful study. There is no basis in these time entries for Wabtec's claim that they reflect duplicative and unnecessary costs.

- Three partners, two at A&P and one at RL&F, were intimately involved in the drafting, editing and review of the motion for an order to show cause and the reply brief to Wabtec's opposition. Items 194-223.[8] These were critical motions in the case and fully warranted the collaborative efforts of the senior members of GETS' legal team. There is no reason to assume, as Wabtec does, that simply because more than one timekeeper billed time for work on the motion to show cause or reply brief, they were doing duplicative and unnecessary work. Such an assumption does not comport with common sense or the realities of complex civil litigation where a collaborative effort among the senior members of a legal team (including Delaware counsel in a Delaware case) is commonplace and necessary for success.[9]

- Wabtec claims that the presence of three partners (one of them GETS' Delaware counsel) throughout the evidentiary hearing and the participation (at a far lower level of hours) of two associates and two legal assistants constituted "duplicative" efforts.

---

[8] Wabtec purports to distinguish between the time spent "drafting the motion to show cause" and "drafting the brief in support of motion to show cause." Items 194-201 and Items 202-212. There is no such distinction. As a review of the time entries shows, they all reflect work on the motion for a show cause order that was ultimately filed on September 20, 2002.

[9] In its observation about the work done by Messrs. Ossola and DeWitt on the briefing for the motion for show cause, Wabtec makes the startling accusation that this was a "wasteful use" of "high priced talent" on matters "easily delegable to less experienced associates." Opp. 15, n.21.

One wonders what GETS' "highly priced talent" should have been doing if not working on the most important briefs filed in the case. Senior partners at A&P and experienced litigators like Mr. DeWitt still take the time and trouble to work on briefs filed under their signature and clients expect them to do so. This case, an important one for GETS, was no exception.



Opp 15, n 22. But the basis for this assertion – that all members of the GETS' legal team did not "participate" in the hearing (Opp 15) – is a red herring. The three senior members of the GETS' legal team (Messrs Ossola, DeWitt and Cottrell) all played an active role in the proceedings. The associates and legal assistants were there to play a supporting role with respect to evidentiary issues, cross-examination and exhibits. This was part of the collaborative effort of the GETS' legal team and cannot be lightly dismissed, as Wabtec suggests, simply because some members of the team did not question witnesses or address the Court.

Turning to Appendix 5, which Wabtec claims constitutes duplicative work "for reviewing, revising and cite checking documents filed with the Court" (Opp 15), GETS offers the following:

- As noted above, there is nothing inherently redundant about having various members of the GETS' legal team – including partners – work on and contribute to important court filings such as the motion for an order to show cause and GETS' reply brief (see, e.g., Items 250-51, 256, 258, 262-67). The majority of the time reflected in Appendix 5 was billed by partners who, in the end, are accountable to their client and to the Court for what is stated in briefs and motions. Given the reality that many issues in litigation (including in this case the motion for an order to show cause) are decided on the papers, it is surprising that Wabtec should see fit to complain about the amount of partner time put into the briefing

- It should be noted that with respect to the time entries in Appendix 5, relatively few of them were those of Mr DeWitt – only a little over        hours spent on the motion, and, more importantly for what Mr DeWitt was doing at the time, working with

12



the expert, Charles Jackson, on his supporting declaration.  (*See* Item 281,

Mr. Ossola spent much more time in the drafting and editing of the briefs,
reflecting a fair and reasonable division of labor that cannot be reconciled with Wabtec's
accusation of redundancy

In Appendix 6, Wabtec singles out time spent largely by Mr. DeWitt and, to a
lesser extent, Mr. Ossola on study and consultations regarding the
FreightCorp 90 system offered to QR.  Opp. 15-16.  Despite the critical importance of
determining whether there was a factual basis for a contempt motion,
Wabtec argues that the    hours of lawyer time spent analyzing the source code was
"duplicative" of the    hours spent reviewing that code by Jackson, GETS' technical
expert.

Wabtec's argument presupposes that GETS' lawyers could responsibly rely on
Jackson's work without themselves gaining at least some hands-on familiarity with the
source code.  This is an incorrect view of the lawyers' responsibilities to their client and
to the Court.  Before GETS' lawyers signed the motion papers, they had to make an
independent legal judgment about whether there was a reasonable basis for not only
alleging contempt, but then proving it by clear and convincing evidence  Jackson, despite
his technical credentials, could not and did not make that judgment  As the court
observed in the *Microsoft* case cited in Wabtec's brief, a technical expert would not be
qualified "to identify what evidence would be required to sustain a civil contempt action,
to target the investigation to obtain such evidence or to transform the raw data obtained



during these investigative pursuits into a successful legal argument. These tasks could only have been performed by attorneys." *Microsoft*, 216 F. Supp. at 390.

### D. The Charges Reflected in Appendix 7 Were Not "Overhead Items"

Wabtec asserts that the legal assistant time shown in Appendix 7 reflects work that

16.

Wabtec offers no support for these charges and there is none. If by "support staff" Wabtec means secretaries, A&P does not use secretaries to handle the kind of document administration tasks reflected in Appendix 7. Instead legal assistants who are assigned to and are familiar with the case perform most document-related tasks, as is common in many law firms responsible for major litigation. Clients expect to be charged for the performance of these tasks and, in fact, they do pay for them.

Wabtec also inaccurately described the tasks reflected in Appendix 2 as "copy services." Opp. 16. While some time entries involved

*See, e.g.*, Items 297, 298, 302, 303, 306, 309, 317. These time entries reflect work traditionally performed by legal assistants and paid for by clients. There is no basis for excluding the charges associated with these tasks from GETS' fee award.

14



E.    Wabtec's Claim of Nearly        ⎧ of "Inadequately
      Documented" Charges Is Without Merit _____

Appendix 8 is a catch-all compilation of time entries totaling nearly

value that Wabtec claims are "inadequately documented" and should be "reduced

significantly." Opp 16-17. In Appendix 9, Wabtec sets forth what it characterizes as

"questionable/unexplained" disbursements that Wabtec urges – without explanation –

should be reduced by nearly

These proposed reductions are unjustified. A review of the time entries listed in

Appendix 8 does not substantiate Wabtec's claim of inadequate documentation [10] On

their face, these entries document time for such tasks as

There is

more than enough detail in these time entries to warrant their inclusion in the fee award.

*See Rode v Dellarciprete*, 892 F 2d 1177, 1190 (3d Cir. 1990) ("[I]t is not necessary to

_____

[10]  Wabtec has removed these time entries from the invoices in which they appeared and
has thereby eliminated the surrounding context that provides a fuller understanding of the
work being performed.



know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney ") (citations omitted).

The same is true of the disbursements identified in Appendix 9   They reflect

functions" relating to work on this case (Items 606, 611, 628)   Again these charges are removed from the context in which they appear in actual invoices, which makes it difficult to associate them with the work being performed at the time.   But the terminology used in these disbursement entries is straightforward and sufficient to warrant reimbursement by Wabtec

## IV.    WABTEC'S PROPOSED DEDUCTION FOR PARTIALLY SUCCESSFUL OR UNSUCCESSFUL CLAIMS SHOULD BE REJECTED AS INCONSISTENT WITH THE OUTCOME AND EQUITIES OF THIS CASE

Wabtec cannot dispute that it was held in contempt based on a violation of *both* of the provisions of the Consent Order on which GETS predicated its contempt allegation – Paragraphs 2 and 4 of that Order.  Opp. 18   But in arguing that the Court rejected "a number of GETS' claims," Wabtec overlooks the forest for the trees, in the apparent hope that it can obscure the reality of what actually happened in this case

It is true that GETS did not succeed on every *theory* of liability and damages that it presented in this case   For example, the Court did not accept GETS' argument that Wabtec's use of a "flow test" violated Paragraph 2 of the Consent Order.   Mem Op  16 (D I  274)  But this "failure" had no impact on the Court's ultimate determination that

REDACTED

Wabtec had, in fact, violated Paragraph 2 based upon its use of reorder messages. Irrespective of whether Wabtec violated Paragraph 2 once or twice, it was – in either case – liable for contempt. Once the Court determined that Wabtec was in contempt by using reorder messages in violation of Paragraph 2, any additional potential violation of that paragraph based on a different theory became superfluous for liability purposes.

The same is true of GETS' argument that Klemanski violated Paragraph 4 of the Consent Order, which played a minor part in the presentation of GETS' case.[11] Once the Court determined that Kull's ongoing involvement violated Paragraph 4, it made no difference, in terms of outcome, whether Klemanski's involvement constituted a separate violation of Paragraph 4.

Turning to the damages issue, Wabtec again mischaracterizes the outcome. In a contempt action, a damages award of $1.8 Million plus a potential additional amount of $2.6 Million in damages is significant by any objective standard. Indeed, none of the contempt cases cited by Wabtec involved a damages award of this magnitude. It is therefore ironic, if not misleading, for Wabtec to argue that GETS had only "partial success" on the damages issue because it did not receive the lost profits award that it sought and instead received a substantial award of lost royalties.[12]

---

[11] Viewed objectively.

[12] Wabtec claims that "[b]y virtue of its overly aggressive litigation tactics, GETS elected to pursue a damage theory that was not supported by the facts known to it from the very beginning." Opp. 19. With due respect for Wabtec's need to concoct some justification as to why GETS should be considered to have "lost" on the damages point, this accusation is simply untrue. There was only one other bidder besides GETS on the QR project, and it was Wabtec. It was entirely reasonable for GETS to argue that "but for" Wabtec's contempt, GETS would have earned its expected profit from the anticipated contract with QR. While the Court ultimately determined that GETS fell short of demonstrating that Wabtec's contemptuous conduct caused GETS' lost profits under its theory, it cannot be denied that the Court found GETS *did* suffer significant lost licensing

Footnote continued on next page

REDACTED

Wabtec overreaches further by suggesting that GETS was only "nominally successful" in its efforts to prove that Kull's involvement violated Paragraph 4 and that Wabtec should be held liable for sanctions for the destruction of his files. Opp. 18 n 25. Wabtec draws attention to the fact that the Court did not award separate damages for this violation, while ignoring entirely the devastating impact of the adverse references adopted by the Court in response to GETS' successful motion for sanctions.

Moreover, all of Wabtec's "partial success" arguments suffer from a false premise. Wabtec incorrectly assumes that in order to have a "successful" damages claim for purposes of a motion for attorneys' fees, GETS must have prevailed on all elements of its damages theory, and must have been awarded the full amount of the damages requested. Under Wabtec's view, anything less than total victory on all points must be viewed as a "partial success" – even if the end result is a significant damages award.

This view is not supported by logic or legal precedent. In *Rode*, 892 F 2d at 1184, for example, the Third Circuit held, following the leading Supreme Court case, that a reduction from the lodestar was justified for hours "spent litigating claims on which the party did not succeed *and that were 'distinct in all respects' from claims on which the party did succeed.*" (Emphasis added) (quoting *Hensley v Eckerhart*, 461 U S. 424, 440 (1983)) Wabtec cannot meet this standard and makes no argument that it does. It simply cannot argue that GETS' lost profits argument was "distinct in all respects" from its licensing/royalty argument. Furthermore, the fact that the Court did not adopt GETS'

---

Footnote continued from previous page
royalties. Whether called lost profits or lost royalties, the Court's damages award was far from trivial



proposed royalty rate of 35%, and instead adopted an effective royalty rate of 25%, does not render GETS' lost profits argument "distinct in all respects" from its royalty argument.[13]

Yet another case cited by Wabtec illustrates that the "partial success" principle has been applied in circumstances very different from those presented here. In *Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1044 (3d Cir. 1996), the Third Circuit upheld the district court's 50% reduction of fees "for his [the plaintiff's] failure to prevail on one of his two central claims, that of discrimination." In that case, the plaintiff had asserted two causes of action, one for discrimination which the district court said was the primary claim, and the other for retaliation for which the plaintiff was awarded a "nominal recovery" of $25,000. *Id.* at 1043. The Third Circuit agreed with the district court that this was an appropriate case to discount the fees for "partial lack of success," especially where the two claims were only tenuously related. *Id.* at 1044.

This case presents a far different set of circumstances. Here GETS' succeeded on both of its central "causes of action" (*i.e.*, violations of Paragraphs 2 and 4). And to the extent it did not succeed in proving *additional* grounds on which to find Wabtec in contempt (such as Wabtec's flow test), the disposition of these claims did not affect the outcome. In any event, the alternative liability theories put forth by GETS (flow test and

---

[13] In *Rode*, the Third Circuit applied this requirement to disallow hours spent on motions to dismiss other defendants; the court found that "[t]he hours worked on these motions did not further successful claims . . ." 892 F.2d at 1186. GETS' unsuccessful lost profits argument does not fall into this narrowly drawn category.

REDACTED

Klemanski), and its lost profits theory, were part of – not separable from – the central causes of action.

## CONCLUSION

GETS respectfully requests that the Court award reasonable attorneys' fees and costs in the amount of

OF COUNSEL:
Charles D. Ossola, Esq
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004-1202
202-942-5075

Timothy R. DeWitt, Esq.
24IP LAW GROUP USA, PLLC
600 Cameron Street
Alexandria, VA 22314
703-340-1686

Dated: October 31, 2005

Frederick L. Cottrell, III, Esq. (#2555)
Cottrell@rlf.com
Anne Shea Gaza (#4093)
Gaza@rlf com
RICHARDS LAYTON & FINGER P A
One Rodney Square
920 N King Street
P.O. Box 551
Wilmington, DE 19899-0551
302-651-7700

ATTORNEYS FOR PLAINTIFF
GE TRANSPORTATION SERVICES
GLOBAL SIGNALING, L.L C.



RLF1-2939976-1

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2005, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing, and hand delivered, to the following:

> Margaret M. Manning, Esq.
> Buchanan Ingersoll PC
> The Nemours Building
> 1007 N. Orange Street – Suite 1110
> Wilmington, DE 19801

I hereby certify that on November 4, 2005, I transmitted the document by Federal Express to the following non-registered participants:

> George Patrick Baier, Esq.
> Buchanan Ingersoll PC
> One Oxford Centre - 20th Floor
> Pittsburgh, PA 15219

> Daniel M. Darragh, Esq.
> Cohen & Grigsby, P.C.
> 11 Stanwix Street - 15th Floor
> Pittsburgh, PA   15222-1319

Frederick L. Cottrell, III (#2555)
COTTRELL@rlf.com